UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| PRIME AID PHARMACY CORP., | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO.: _____ |
| EXPRESS SCRIPTS, INC., | : |
| Defendant. | : |

## PLAINTIFF PRIME AID PHARMACY CORP.'S  COMPLAINT
## AGAINST DEFENDANT EXPRESS SCRIPTS PHARMACY, INC.

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ................................................................................. 1

II.    EXPRESS SCRIPTS EMPLOYS PRETEXT TO PRECLUDE
PRIME AID FROM ITS NETWORK ................................................. 5

III.    ANY WILLING PROVIDER ............................................................. 6

IV.    JURISDICTION AND VENUE ......................................................... 7

V.    PARTIES .......................................................................................... 7

VI.    FACTUAL BACKGROUND ............................................................. 8

    A.    Pharmacy Benefit Managers and Express Scripts ................................. 8

    B.    Specialty Pharmacies and Prime Aid .................................................. 9

        1.    Specialty Pharmaceuticals ....................................................... 9

        2.    Specialty Pharmacies ........................................................... 10

        3.    Prime Aid ............................................................................. 11

    C.    Prime Aid's Application to Join Express Scripts' Network and Express
Scripts' Sham Excuses for Refusal to Allow Access ............................ 12

VII.    EXPRESS SCRIPTS' REJECTION OF PRIME AID'S
APPLICATION VIOLATES NEW JERSEY'S ANY WILLING
PROVIDER LAWS ........................................................................... 16

VIII.    ANTITRUST ALLEGATIONS ........................................................ 17

    A.    Relevant Market:  Express Scripts Network Market for Specialty
Pharmacy Services .......................................................................... 18

    B.    Market Power .................................................................................. 19

    C.    Anticompetitive Conduct .................................................................. 21

    D.    Harm to Competition and Antitrust Injury .......................................... 23

FIRST CAUSE OF ACTION: DECLARATORY RELIEF ............................... 24

SECOND CAUSE OF ACTION: INJUNCTIVE RELIEF ............................... 25

i

THIRD CAUSE OF ACTION: VIOLATION OF SECTION 2 OF THE
    SHERMAN ACT ............................................................................................26

FOURTH CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE
    SHERMAN ACT ............................................................................................28

FIFTH CAUSE OF ACTION: VIOLATION OF NEW JERSEY
    ANTITRUST ACT..........................................................................................29

JURY DEMAND .........................................................................................................32

DM1\6623365.12

## I.   <u>BACKGROUND</u>

1.     This case is brought by Plaintiff Prime Aid Pharmacy Corp. ("Prime Aid"), a specialty pharmacy located in Union City, New Jersey, harmed by the illegal conduct of Pharmacy Benefit Manager ("PBM"), Defendant Express Scripts, Inc. ("Express Scripts").[1]  As the country's largest PBM, Express Scripts maintains control over prescriptions for millions of patients in the United States, many of whom live in New Jersey.  In addition to operating a PBM, Express Scripts or affiliates under common control also operate captive mail order pharmacies, including the Accredo mail order pharmacy.  Like Prime Aid, Accredo fills prescriptions for specialty drugs.  Unlike Prime Aid, Accredo has no physical presence in New Jersey and fills all New Jersey prescriptions by mail order.

2.     The need for an in-state specialty pharmacy is especially acute because Prime Aid presently services over 5,000 New Jersey residents suffering from acute chronic conditions (i.e., Hepatitis-C, HIV and rheumatoid arthritis).  Many of these patients speak English only as a second language.  Due to their illnesses, many are severely compromised.   The appropriate dispensing of medication for these drugs requires monitoring for compliance.  In some cases, interruptions in treatment may have severe medical consequences.  The limitations of mail order are not best suited to these patients.

3.     In violation of New Jersey's Any Willing Provider law and the antitrust laws of both the United States and New Jersey, Express Scripts has acted with anticompetitive intent and with total disregard for the health and welfare of its patients in New Jersey.  It has ousted Prime Aid from its provider network, absent any of the required notice or due process.

---

[1]     As a PBM or Pharmacy Benefit Manager, Express Scripts manages prescription drug programs and is primarily responsible for the processing and payment of prescription drug claims.

4. Express Scripts has sought to exclude Prime Aid from its Network knowing that Prime Aid extends services to New Jersey residents that cannot be provided by mail order. Prime Aid has demonstrated that it is able to comply with the conditions for performance in Express Scripts' Network, even while Express Scripts' own Mail Order Provider has paid in excess of $45 million to settle claims of violations of the False Claims Act and the Anti-Kickback Act.

5. Express Scripts' exclusion of Prime Aid from its Network is motivated by its desire to drive Prime Aid's patients to its own specialty pharmacy and with the specific intent to exploit its control over PBM services for its New Jersey patients. It is an attempt to monopolize the market for specialty pharmacy services to New Jersey residents locked into their use of Express Scripts' PBM services.

6. If not stopped, Express Scripts' wrongful conduct will likely monopolize its captive market for specialty medications. It is not just Prime Aid, but healthy competition and the welfare of severely compromised patients, that are being harmed by Express Scripts' anticompetitive scheme.

7. Express Scripts has abused the exclusive dealing arrangements it has with health plans and employers doing business in New Jersey by excluding Prime Aid from access to New Jersey patients requiring specialty pharmacy services.

8. Express Scripts' exclusionary conduct is not unique to Prime Aid. As attorney David A. Balto testified before the Regulatory Reform, Commercial and Antitrust Law Subcommittee of the House Judiciary Committee:

> PBMs increasingly engage in anticompetitive, deceptive or egregious conduct that harms consumers, health plans, and pharmacies alike. In a nutshell, both consumers and pharmacies suffer as consumers are increasingly denied a

choice in their level of pharmacy service by PBMs. PBMs exercise their power to restrict consumers to the PBM's own captive mail order and specialty pharmacy operations, reducing choice and quality for many.

. . .

This is especially true for specialty pharmacies. Specialty pharmacies manage the highly-expensive and very complex treatments for the most intricate and serious illnesses. The service they provide is both distinct and significant from other retail pharmacies. Beyond merely dispensing drugs, specialty pharmacies help administer complex treatments, assist physicians in monitoring patient therapy, and play an important role in medication compliance and improved health outcomes. Specialty pharmacies educate patients on effective utilization, monitor side effects, and partner with physicians to identify ineffective medications and recommend treatment changes. Specialty pharmacies play an active role in providing continuity of patient care to ensure that costs are minimized and health outcomes improve. And there is clear evidence that patients needing specialty medications have better health outcomes when they have the services of a community pharmacy rather than being forced into a PBM-owned mail order operation.

. . .

More recently, PBMs are finding new revenue sources through egregious conduct. Some PBMs are using audits not just as a means of supposedly combating fraud but rather as a mechanism to secure greater revenue. PBMs engage in a variety of audit tactics such as "extrapolating" errors to inflate recoveries. Some PBMs rely on unfair and technical errors to withhold substantial funds from providers despite evidence that patients properly received dispensed medications.

9.      Since cementing its market power as the largest PBM in the United States through Express Scripts Holding Company's acquisition of Medco Health Solutions, Inc., Express Scripts has mounted a campaign to eliminate competition from independent specialty pharmacies in the market for patients locked into Express Scripts' PBM.

10.     Express Scripts' anticompetitive behavior is not limited to Prime Aid in New Jersey.  It is alleged, in separate settled and pending actions in other jurisdictions, to have conspired with other PBMs to eliminate competition from independent compounding pharmacies.  Express Scripts is deploying a similar strategy to monopolize specialty pharmacy services in its Network at the expense of patients who are locked into that Network as well as other independent specialty pharmacies like Prime Aid.

11.     Prime Aid has operated a specialty pharmacy in New Jersey since 2006.  It boasts a well-deserved reputation for providing extraordinary service.  As a result, it has secured the confidence and trust of prescribing physicians and clinics, as well as the underserved and critically ill patients who require the guidance and support it provides.

12.     Prime Aid started as a store front pharmacy striving to provide superior service to a limited number of patients.  It has since developed into a substantial competitor for the specialty pharmacy services offered through PBM-affiliated mail order pharmacies.  Depending on a group of in-house pharmacists and nurses, it meets the demands of the physicians and patients it serves in both the administration of the drugs and monitoring symptoms and compliance.

13.     In filling tens of thousands of specialty drug prescriptions, Prime Aid has distinguished itself in New Jersey.  Its nurses regularly visit patient homes to assist patients in the initiation of treatment.  Prime Aid's  staff  is multilingual, providing assistance to patients in Spanish, Russian, Vietnamese and Chinese dialects and other languages in order to make certain that patients understand the details of administration of the medications as well as the monitoring of symptoms.

14.     Through its superior service, Prime Aid has established working and referral relationships with many of the premier hospitals and medical practices in New Jersey.  These relationships are now jeopardized by the Express Scripts' exclusion.  Employing pretextual reasons for denial, Express Scripts refuses to allow a substantial and increasing percentage of its patients who are locked into its provider network from using the services of Prime Aid.

15.     It is only now that Prime Aid has grown its business and Express Scripts has acquired its own specialty pharmacy with a capability of mail ordering specialty drugs that Prime Aid's ability to provide personalized services to physicians and patients has become an impediment to Express Scripts' drive to monopolization of the market for specialty pharmacy services for patients locked into its Network.

16.     Mergers and consolidation of PBMs (including the merger of Express Scripts and Medco) have concentrated a substantial market power in the hands of a limited number of PBMs. The abuse of that market power has become acute in markets for specialty pharmacy services.

17.     In flagrant violation of New Jersey's Any Willing Provider laws, Express Scripts has ignored the needs of prescribing physicians and their patients' requirements in order to drive the lucrative specialty pharmacy business to its captive mail order specialty pharmacy.  This conduct adversely affects the level of service and quality of care available to patients in great need, and does so at the risk of tragic consequences.

## II.    EXPRESS SCRIPTS EMPLOYS PRETEXT TO PRECLUDE PRIME AID FROM ITS NETWORK

18.     On January 11, 2016, Prime Aid submitted an application to join Express Scripts' Network.  On January 22, 2016, Express Scripts notified Prime Aid that Prime Aid's application to join Express Scripts' Network was denied.  In its denial, Express Scripts failed to comply with New Jersey's Any Willing Provider law.  It failed to provide an adequate statement of its basis

for rejection of Prime Aid's application and also failed to state what remediation Prime Aid might employ to gain admittance to the Express Scripts Network.

19.     At all times, Prime Aid has been and remains ready, willing and able to meet the terms and conditions for participation in the Express Scripts Network.

## III.    ANY WILLING PROVIDER

20.     New Jersey's Any Willing Provider law requires that health plans and PBMs are to admit any provider, including a specialty pharmacy such as Prime Aid, into their networks, if the provider is willing to meet the terms and conditions the insurer or PBM requires of its network providers.

21.     As addressed below, Express Scripts' summary denial for the reason "Denied: Program Integrity Alert" fails to set forth the specific factors upon which the decision was based as required by the Any Willing Provider law and is simply a cover for its anticompetitive goal to eliminate Prime Aid as a ready, willing and able competitor.

22.     Express Scripts' effort to bar Prime Aid from its Network is designed to steer patients who would otherwise utilize Prime Aid for their medications and their administration to its other affiliated pharmacies, thereby enabling Express Scripts to monopolize the market for patients requiring specialty medications who are locked into the Express Scripts Network.

23.     Prime Aid seeks a declaratory judgment finding that Express Scripts' denial of Prime Aid's application violates New Jersey's Any Willing Provider laws.  It also seeks an order that Express Scripts is required to admit Prime Aid into its Network, compensatory damages and treble damages, injunctive relief, costs and attorneys' fees for violations of the antitrust laws of the United States and New Jersey.

## IV.   JURISDICTION AND VENUE

24.     Prime Aid's claims against Express Scripts include claims arising under the federal antitrust laws, including Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1337 because one or more claims arise under the laws of the United States and the antitrust laws, in particular, and pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

25.     This Court further has subject matter jurisdiction over Prime Aid's claims arising under state law pursuant to 28 U.S.C. § 1367, because those claims are related to the claims that arise under federal law and form part of the same case or controversy.

26.     This Court has personal jurisdiction over Express Scripts, as it conducts substantial business in New Jersey, which has a significant impact upon the residents of New Jersey.

27.     Venue is proper in this District under 28 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391, as a substantial part of the events giving rise to this action occurred in New Jersey and because the Express Scripts is subject to personal jurisdiction in New Jersey.

## V.   PARTIES

28.     Plaintiff Prime Aid Pharmacy Corp. is a New Jersey corporation with its principal place of business at 3915 Bergenline Avenue, Union City, New Jersey.  Prime Aid is the most prominent independent specialty pharmacy in New Jersey.  On information and belief, it is one of only a few specialty pharmacies that has a physical presence in the entire state.  It presently services thousands of New Jersey patients suffering from acute chronic conditions. It annually fills tens of thousands of medications for New Jersey residents.

29.     Prime Aid services its New Jersey patients with staff speaking at least seven different languages and has working relationships with most of the premier hospitals and healthcare providers in New Jersey.  Prime Aid is currently licensed in approximately forty (40) states (including New Jersey), although the vast majority of its business is local to the New Jersey-New York region.  It is a New Jersey Medicaid provider and is certified by the two most widely recognized evaluators of health care delivery, URAC and JCAHO.

30.     Defendant Express Scripts, Inc. is a Pharmacy Benefit Manager or PBM, as defined above.  As a PBM, Express Scripts processes and administers the payment of health insurance claims submitted to insurers or self-insured employers by health care providers, including specialty pharmacies like Prime Aid.

## VI.     FACTUAL BACKGROUND

### A.     Pharmacy Benefit Managers and Express Scripts

31.     The pharmaceutical industry involves patients, physicians who write prescriptions, pharmacies that dispense medications, health insurance plans, drug manufacturers, and PBMs.

32.     PBMs manage an insurance company, health plan or self-insured employer's prescription drug program.  PBMs process and make payments on claims submitted to them for prescription medications which are then dispensed by a pharmacy to a patient.  PBMs also administer the pharmacy benefits for insurance companies, negotiate medication pricing with drug manufacturers and decide which medications and what form of the medication are covered under the various plans that an insurance company provides.

33.     Express Scripts is one of the largest PBMs in the United States and in New Jersey.

34.     In addition to acting as a PBM, which involves processing and making payments on claims, Express Scripts and its affiliates also operate captive pharmacies, which supply

specialty pharmacy medications via mail order. When Express Scripts, the largest PBM in the United States, acquired the then third-largest PBM in the United States, Medco, in 2012, Express Scripts' specialty pharmacy, CuraScript, was combined with Medco's specialty pharmacy, Accredo. Express Scripts' specialty pharmacy controls over thirty (30%) percent of the specialty pharmacy business in the United States, much of that concentrated in providing captive services to patients who are locked into use of the Express Scripts' PBM through their group insurance plans.

35.     Every claim submitted by independent pharmacies to Express Scripts for processing is a claim that Express Scripts' Accredo might otherwise process. The revenues received by an independent specialty pharmacy might otherwise be received by Express Scripts. Specialty pharmacy revenues are particularly significant because of the high cost of specialty medications. By excluding willing and able specialty pharmacies, like Prime Aid, from its Network, Express Scripts can drive Prime Aid's specialty medication patients and the revenues its prescriptions generate to its own captive pharmacies.

**B.     Specialty Pharmacies and Prime Aid**

    **1.     Specialty Pharmaceuticals**

36.     Medications designated as "specialty pharmaceuticals" require special treatment for a host of reasons. Typically not available through retail pharmacies, these medications are used in the treatment of complex, chronic conditions, such as HIV, Hepatitis C, rheumatoid arthritis and organ transplants. They are much more expensive than traditional pharmaceuticals and they require special handling and care in distribution and administration. Patients require monitoring for compliance and education for proper self-treatment.

37.     Many specialty medications are derived from plasma-based proteins, which make them unstable. They require extensive care in handling in order to ensure sterility, safety and

stability. They often need to be stored and shipped at a certain temperature and in special containers.

38.     Many specialty pharmaceuticals require injections or infusion. Often patients are called upon to perform injections themselves. Training is often required. Improper administration or monitoring of symptoms can lead to severe side effects and interfere with the efficacy of critical and expensive treatment regimens.

### 2.     Specialty Pharmacies

39.     Specialty pharmacies dispense specialty pharmaceuticals and provide related services.

40.     Some states, including New York, expressly require by law or regulation that the specialty pharmacies have a brick and mortar presence in the state so as to facilitate the demands of special care and attention required in dispensing these expensive medications for severe medical conditions. Many of the specialty drugs spoil quickly. Many require special regimens for administration, including injections that many patients have difficulty performing themselves. Because New Jersey does not expressly mandate brick and mortar presence for specialty pharmacies, almost no specialty pharmacies operate and provide personal services in the state.

41.     Specialty pharmaceuticals are expensive, thus raising a host of issues of payment, reimbursement and cash flow. Even if a drug is covered under a health plan, co-payments and deductibles create significant issues for both the patient and the dispensing pharmacy. Specialty pharmacies bear significant costs in closely managing an inventory which is particularly expensive and prone to spoiling, while providing needed services to patients in seeking waivers and manufacturer funding of co-pays and deductibles.

42.     Specialty pharmacies provide clinical support.  This support includes providing licensed pharmacists and nurses who assist patients with proper administration.  They answer questions that inevitably arise in the administration of specially pharmaceuticals.  Clinical support also includes patient education and counseling.

43.     Beyond education and counseling, specialty pharmacies monitor patient compliance with the treatment regimen, including timing, dosage and symptoms.

### 3.     Prime Aid

44.     On information and belief, there are less than five (5) specialty pharmacies located in New Jersey.  Of these, Prime Aid is the largest in terms of patients and prescriptions. It delivers specialty medications and supports doctors and patients across the entire state.

45.     Prime Aid provides extraordinary service in helping doctors and patients communicate and coordinate as needed to address the special needs for administration of these medications.

46.     Prime Aid's ability to track patient needs and compliance using its proprietary computer software programs and local presence was seen most recently when it made certain that drug deliveries were made ahead of the blizzard that struck the state the weekend of January 23-24, 2016.

47.     Local presence was also critical when Hurricane Sandy struck New Jersey.  When the hurricane disrupted communication, transportation and medical shipments in New Jersey, Prime Aid had employees make deliveries by bicycle and other means to provide the support needed for proper administration of the specialty drugs.

48.     Physicians and clinics prefer to deal with Prime Aid over mail order specialty pharmacies due to the extraordinary demands in the delivery and administration of specialty

drugs, as well as Prime Aid's proven ability to provide effective specialty pharmacy services in New Jersey.

49.     On information and belief, Prime Aid is the only specialty pharmacy in New Jersey which maintains the resources to provide multilingual management of specialty patient needs.

50.     Prime Aid employs approximately fifty (50) New Jersey residents, including pharmacists and nurses whose livelihood depends upon employment with Prime Aid, which, in turn, depends upon revenue generated by filling medications for residents of New Jersey.

51.     Due to compromised health of its specialty patients, Prime Aid's physical presence in the state presents a great convenience in emergency situations.

### C.     Prime Aid's Application to Join Express Scripts' Network and Express Scripts' Sham Excuses for Refusal to Allow Access

52.     On January 11, 2016, Prime Aid submitted an application and all required supporting documentation to Express Scripts to be admitted into Express Scripts' Network.  A copy of Prime Aid's application is attached hereto as Exhibit "A".

53.     On January 22, 2016, Express Scripts responded, denying Prime Aid's application.  A copy of Express Scripts' response is attached hereto as Exhibit "B".

54.     In its response, Express Scripts advised that it was denying Prime Aid's application on the alleged basis of a "Program Integrity Alert."  The letter was devoid of any explanation as to what type of "alert" required denial of the application, or what factors were considered in processing Prime Aid's application.

55.     As explained in the January 26, 2016 letter from Prime Aid's counsel to Express Scripts' counsel, attached as Exhibit "C", the January 22, 2016 notice from Express Scripts of denial of Prime Aid's application failed to comply with the requirements of the Any Willing

Provider law.  It failed to provide an explanation of the basis of the denial and the factors considered by Express Scripts, and also failed to explain what steps Prime Aid might need to take to qualify for the network.

56.     Express Scripts' response was a letter dated February 2, 2016, attached as Exhibit "D", which purports to explain Express Scripts' refusal to comply with the Any Willing Provider law by suggesting that Express Scripts' relationship to Prime Aid was not governed by that law.

57.     Express Scripts' response suggests that Prime Aid was terminated from the Express Scripts Network in mid-2014 for what the letter describes as "numerous breaches" of an earlier agreement with Express Scripts, which was not in effect at the time Prime Aid submitted its application.  To the contrary, Express Scripts' refusal to admit Prime Aid into the Express Scripts Network was not based on the reasons set forth in the letter.

58.     Express Scripts' refusal to re-admit Prime Aid into its Network is in keeping with its scheme to deny locked-in patients the opportunity of choice and service that might otherwise be provided by that specialty pharmacy.

59.     Express Scripts supposedly terminated Prime Aid based on a routine audit of claims in March 2014, in which it claimed that there were $142,845.72 in allegedly inadequately documented claims.  Prime Aid contacted the third party wholesaler whose supply to Prime Aid was at issue for proper documentation.   Express Scripts ultimately admitted the adequacy of the documentation and then conceded that it had also been improperly withholding $4 million from Prime Aid.

60.     The improper withholding of reimbursement had been particularly damaging to Prime Aid in a business where cash flow and the maintenance of inventory is so critical.

61.     Among the false reasons justifying termination was that Prime Aid  engaged in systematic and continuous failure to reverse claims regarding medications not received by patients, purportedly on seven occasions.  While Prime Aid had been part of Express Scripts' Network from 2006 until August 8, 2014, and had filled <u>tens of thousands</u> of medications for Express Scripts' insureds in that timeframe, Express Scripts' termination notice refused to identify the <u>seven</u> specific prescription numbers at issue.

62.     Express Scripts provided no evidence or support that, of the tens of thousands of prescriptions filled by Prime Aid over the course of approximately eight (8) years that, on seven occasions, patients did not receive their medications.  On the contrary, as explained by Prime Aid in response to the termination notice, it is commonplace for physicians to request that they receive the specialty medications directly from Prime Aid in order to train their patients in the appropriate protocol for taking such medications, record the specific date on which treatment commences and to make sure that the patient qualifies to begin the treatment on the date of the office visit.  In any event, Express Scripts never substantiated its allegations that Prime Aid did not deliver all medications for which it sought reimbursement.

63.     In support of the 2014 termination, Express Scripts also stooped to rely on a $750 fine levied on Prime Aid by the New Jersey Board of Pharmacy in 2012.  That nominal fine was based on a **2011 state inspection**.  Prime Aid paid a $750 fine to settle a disputed matter and avoided any disciplinary proceeding.  The fine related to a Prime Aid Pharmacist allegedly filling a medication based upon a telephone call from a physician's office in lieu of a written prescription.

64.     The settlement and payment of a $750 fine cannot be legitimate grounds for refusing to admit Prime Aid to the Express Scripts Network.  If such settlements were grounds

for refusal to admit or expulsion, Express Scripts could not credibly maintain its Accredo Health Group Inc. ("Accredo") specialty pharmacy in its PBM Network.  Nothing in Express Scripts' Provider Manual or Provider Agreement permitted Express Scripts to terminate Prime Aid based on this alleged incident.

65.     Express Scripts' Provider Manual, as of 2014, stated that a provider is required to "immediately notify PBM in writing in the event of any action against Network provider . . ." However, by paying the nominal fine, the State specifically stated that Prime Aid avoided "any action."  See Exhibit "E" ("the board has determined that it will offer you an opportunity to settle this matter and thereby avoid the initiation for disciplinary proceedings.")  (emphasis added).

66.     On April 30, 2015, specialty pharmacy Accredo agreed to pay (not $750) but $45,060,598.87, plus interest, for violations of the False Claims Act and the Anti-Kickback Act, to settle allegations brought by the United States Department of Justice that Accredo participated in a patient referral kickback scheme with a drug manufacturer.  The claims, uncontested by Accredo, included increasing refills by having nurses call patients to reiterate the potential adverse effects of discontinuing treatment, while failing to provide the fair balance of the common side effects of treatment.

67.     Similarly, Medco Health Systems Inc., another wholly-owned subsidiary of Express Scripts Holding Company, agreed in May 2015, to pay $7.9 million to settle allegations of the United States Department of Justice that Medco violated the False Claims Act in receiving kickbacks from a drug manufacturer.  Express Scripts also agreed to pay several million dollars to settle allegations brought by the Attorneys General of 28 states that it engaged in improper conduct to switch medications, not in the patient's best interest, but to increase payments to Express Scripts.  Medco also agreed to pay $155 million for alleged False Claims Act and Anti-

Kickback Act violations in 2006, including allegations of soliciting and receiving kickbacks from manufacturers and paying kickbacks to induce health plans to award Medco contracts for mail order pharmacy business.

## VII.   EXPRESS SCRIPTS' REJECTION OF PRIME AID'S APPLICATION VIOLATES NEW JERSEY'S ANY WILLING PROVIDER LAWS

68.   As required by New Jersey's Any Willing Provider laws, any pharmacy that agrees to the terms and conditions set forth by any insurer, hospital service corporation, medical service corporation, health service corporation, or health maintenance organization shall not be denied the right to participate as a preferred provider or as a contract provider. See N.J. P.L. 1999, ch. 359, approved Jan. 18, 2000, N.J. Stat.§ 17:48-6j; 17:48A-7i; 17:48E-35.7; 17B:26-2i; 17B:27-46.1; 26:2J-4.7.   Under these same laws, no patient in New Jersey can be required to obtain pharmacy services and prescription drugs from a mail service pharmacy. See N.J. Stat. § 17:26-2.1i (a)(4)(a).

69.   Prime Aid has, at all relevant times, been ready, willing and able to meet the terms and conditions that Express Scripts applies.

70.   Prime Aid has demonstrated that Express Scripts' rejection of Prime Aid is without any factual or legal basis.

71.   The inspections and audits which Express Scripts cited in its letter are routine matters in the pharmaceutical industry and constitute neither an active public disciplinary action nor a history of audit discrepancy.

72.   The language and directive of New Jersey's Any Willing Provider laws are clear; Express Scripts' actions violate those laws.

## VIII.   ANTITRUST ALLEGATIONS

73.   Express Scripts has engaged in a sham exercise, denying due process and refusing to allow Prime Aid, a willing provider, access to its Network on pretextual grounds.  Access to that Network is essential to its ability to continue to compete in the relevant market with Express Scripts' specialty pharmacy.  In the process, notwithstanding New Jersey's Any Willing Provider laws, Express Scripts is denying patients and physicians the provision of superior services which they have repeatedly chosen over Express Scripts' specialty pharmacy in the marketplace when allowed a choice.

74.   Express Scripts has entered into agreements with health insurers and others through which it has obtained exclusive rights to determine what specialty pharmacies may provide services to the millions of patients who are locked into use of Express Scripts' PBM services.  These agreements, as applied by Express Scripts, illegally and unreasonably restrain trade, deprive patients and doctors of meaningful choices, superior service, and eliminate and foreclose competition from independent specialty pharmacies with the size and ability to meaningfully compete with specialty pharmacies affiliated with PBMs by offering superior services to patients and doctors.

75.   Patients who are insured in plans subjected to Express Scripts' PBM Network are locked into using specialty pharmacies approved by Express Scripts.  On information and belief, prior to its termination, Prime Aid was servicing a substantial percentage of the specialty drug prescriptions in the Express Scripts Network of New Jersey residents, in competition with Express Scripts' own specialty mail order pharmacies.  Express Scripts has acted with a specific intent to monopolize this market and its continued conduct, such as that deployed against Prime Aid, has a reasonable probability of succeeding.

76.    Express Scripts' wrongful conduct and agreements providing it with the power to exclude competition restrain trade and exclude Express Scripts' most effective competition from major independent specialty pharmacies like Prime Aid.  They deny independent pharmacies access to a locked-in patient specialty pharmacy market, harming competition and consumer welfare.

77.    The agreements, restraints and conduct relating to specialty pharmacy services and drugs and PBM services as alleged in this Complaint are in the regular, continuous and substantial flow of intrastate commerce within the State of New Jersey and interstate commerce in the United States.  They have a direct, substantial, and reasonably foreseeable effect and impact on such intrastate and interstate commerce.

**A.    Relevant Market:  Express Scripts Network Market for Specialty Pharmacy Services**

78.    A relevant market in which Prime Aid competes with Express Scripts, has competed with Express Scripts, and/or would compete with Express Scripts but for the unlawful exclusionary conduct of Express Scripts, is the market for specialty pharmacy services to insureds in the Express Scripts Network in New Jersey.

79.    Patients in health plans for which Express Scripts serves as the PBM are locked into the use of only specialty pharmacies in the Express Scripts Network to dispense specialty drugs and provide related services.

80.    In recognition of the fact that patients are locked into their PBM networks and the importance of the patient's right to choose its pharmacy and the right of pharmacies independent of PBMs to continue to serve patients, many states, including New Jersey, have enacted Any Willing Provider Laws, which require PBMs to admit pharmacies to their networks.

81.     Although PBMs, such as Express Scripts, have used various tactics to force specialty drugs into mail order delivery by their own pharmacies and away from independent pharmacies, many patients and physicians prefer the personal service and care provided by a local specialty pharmacy.  Health plans and plan sponsors also seek health care service providers which can provide services in the local geographic area in which plan participants reside and work.  Pharmacies, including specialty pharmacies, are subject to regulation by state law, and those providing specialty pharmacy services in New Jersey must comply with the laws of New Jersey.  The relevant geographic market for specialty pharmacy services is the State of New Jersey.

82.     Nowhere is the importance of access to PBM networks more important than with respect to specialty drugs.  Because of the severity of conditions treated by specialty drugs and the high expense of the drugs, patients requiring specialty drugs cannot simply choose to go out of network and pay for the drugs themselves.  Further, hands-on, local services are particularly important to patients who need specialty pharmaceuticals.

83.     The agreements, restraints and conduct at issue have had a direct and substantial adverse effect on competition and consumer welfare in the market for specialty pharmacy services to patients in New Jersey locked into the Express Scripts Network.  The result is a diminution in the level of service and the quality of care in specialty pharmacy services.  Those services are substantially below that which would prevail in a competitive market in which physician and patient choices were given due consideration.

**B.     Market Power**

84.     Express Scripts holds market power in the market for specialty pharmacy services for patients locked into the Express Scripts Network in New Jersey.  It has the power to exclude competition.  It has exercised that power by sham termination and exclusion of successful

specialty pharmacy providers like Prime Aid.  It has used its power to exclude competition to increase its market share and its market power by terminating and/or excluding successful specialty pharmacy providers from its network and driving patients to its captive or affiliated specialty pharmacies.

85.     On information and belief, Express Scripts' captive pharmacies fill a substantial percentage of the specialty prescriptions for New Jersey residents locked into its network. Absent its wrongful exclusion from the Express Scripts Network, Prime Aid would be filling many of those same specialty prescriptions for New Jersey residents locked into the Express Scripts Network.  Express Scripts has driven, or is in the process of driving, those same patients to its own captive pharmacies.  Express Scripts has the ability and intent to continue to increase its market share through further sham terminations, refusals to deal, studied refusal to observe the requirements of the New Jersey Any Willing Provider laws, and other wrongful practices.

86.     Express Scripts has used its power to exclude competition to create significant barriers to successful entry or expansion in the market for specialty pharmacy services for patients locked into the Express Scripts Network.  A regular practice in the industry, which, on information and belief, Express Scripts has employed, is to allow any out-of-network specialty pharmacy to fill the first order of a specialty drug, but then to require all future orders to be made through the PBM's specialty pharmacy, impeding entry into the market.  Once an independent specialty pharmacy like Prime Aid garners a significant amount of specialty pharmacy business, it becomes a target for Express Scripts.  Express Scripts uses its power to terminate participation and drive the pharmacy's business to its own captive specialty pharmacy, thereby increasing its market power.

87.    The power of Express Scripts to exclude, coupled with powerful incentives to drive lucrative specialty pharmacy business in its Network to its own captive specialty pharmacies, create significant barriers to meaningful entry, expansion and penetration in the relevant market for specialty pharmacy services to patients locked into the Express Scripts Network.  Specialty pharmacies like Prime Aid that have begun to have a positive impact on the market, are being smothered by wrongful terminations and exclusions, with PBMs like Express Scripts disciplining independent specialty pharmacies and others who challenge their captive pharmacies by terminating them on sham grounds.

### C.    Anticompetitive Conduct

88.    Express Scripts holds exclusive rights as a PBM to millions of patients who are members or subscribers to health plans that use Express Scripts.  These patients did not and cannot choose their own PBM -- they are locked into the PBM chosen by their health plans. Express Scripts is abusing its power to exclude competition to eliminate its key Network competitor for lucrative specialty pharmacy services in this state.  It is forcing physicians and patients to forego their choice of Prime Aid as their specialty pharmacy and accept Express Scripts' inferior captive mail order special pharmacy.

89.    This force-placed inferior service has no place in a competitive market, much less in one in which the PBM effectively acts as the fiduciary of the patient in securing appropriate services from providers over which the patient is supposed to have had the ultimate choice.

90.    Access to the Express Scripts Network is essential to a specialty pharmacy's ability to compete in the relevant market for specialty pharmacy services to locked-in New Jersey insureds.  Despite Prime Aid's years of superior performance in its network, Express Scripts has acted without due process in excluding Prime Aid from participation in the Network based on false and pretextual reasons.

91.     Express Scripts' exclusion of Prime Aid is not in good faith.  The exclusion does not relate to any legitimate performance problems or legitimate concerns in the service of patients or compliance with network requirements.

92.     Express Scripts has acted arbitrarily and without due process in excluding Prime Aid solely to reduce competition for specialty pharmacy services while increasing Express Scripts' profits, market share and market power in order to obtain a monopoly in the market for such services.

93.     Upon information and belief, Express Scripts, which already maintains control over most of the specialty pharmacy prescriptions, also intends to monopolize the market for specialty pharmacy services to New Jersey residents in its Network.   It does so with full knowledge that patients are locked into the Network, and unable to go elsewhere for expensive specialty drugs.  By excluding its most effective competitor, Prime Aid, and deploying additional anticompetitive practices, Express Scripts has a reasonable probability of succeeding in monopolizing this market.

94.     On information and belief, Express Scripts has numerous contracts with health insurers, health plans or self-insured employers that provide it with exclusive rights to determine which specialty pharmacies will be allowed to provide specialty pharmacy services to the patients who are insured by or participate in those respective plans.  The agreements through which Express Scripts obtains these exclusive rights are agreements in restraint of trade.  The cumulative effect of these agreements and Express Scripts' exercise of its exclusive rights under these contracts is to foreclose Prime Aid from competition in the market for specialty pharmacy services to insureds in the Express Scripts Network.

95.     Express Scripts has acted arbitrarily and without due process in terminating Prime Aid from its Network in order to increase its market power and control a larger share of the highly profitable market for specialty pharmacy services to Network insureds.  Express Scripts' exclusive dealing contracts, coupled with its wrongful conduct, foreclose meaningful competition in its Network.

96.     These exclusive dealing arrangements foreclose competition, harm competition and consumer welfare to harm Prime Aid, endangering the survival of its business, as well as its ability to serve the patients, clinics and doctors of New Jersey.

**D.      Harm to Competition and Antitrust Injury**

97.     Prime Aid is a high quality local specialty pharmacy that offers superior services to patients and prescribing physicians in the New Jersey area.

98.     Competition for health care services occurs on several dimensions.  Competition for level and quality of service  is of particular importance in the dispensing of specialty drugs and the provision of related services.  Prime Aid, with its local presence, and its history and continuing ability to provide extraordinary services to meet the needs of patients receiving and doctors prescribing specialty drugs in the New Jersey area is a superior specialty pharmacy.

99.     To the extent Express Scripts may grant collusive reciprocal access to specialty pharmacies controlled by other PBMs, those specialty pharmacies, unlike Prime Aid, do not effectively compete with respect to levels and quality of local services offered by Prime Aid and desired by consumers.

100.    Acting solely in the interest of its profits, Express Scripts' illegal conduct has driven satisfied customers of Prime Aid into its captive mail order specialty pharmacy harming competition and the welfare of consumers.

101.    Prime Aid is by far, the largest of approximately five (5) independent specialty pharmacies in the state of New Jersey.  Doctors and clinics around the state regularly rely on Prime Aid to meet the unique needs of those requiring specialty drugs.

102.    When Prime Aid was part of the Express Scripts Network in calendar year 2013, it filled millions of dollars in specialty prescriptions comprising a material portion of the specialty prescriptions in that Network.

103.    In the market for specialty pharmacy services to insureds in the Express Scripts Network, the exclusive agreements through which Express Scripts has established its exclusive PBM network, coupled with Express Scripts' illegal exclusionary conduct, will foreclose Prime Aid entirely from the relevant market in which it competes with Express Scripts.

104.    Prime Aid has been injured in its business and property by reason of Express Scripts' anticompetitive conduct including its denial of patient and doctor choice of the quality local service of Prime Aid over lower quality mail order specialty pharmacy services forced on those patients and doctors by Express Scripts' conduct and the anticompetitive restraints and flaunting of the policy of the State of New Jersey's Any Willing Provider Law.

## FIRST CAUSE OF ACTION:
## DECLARATORY RELIEF

105.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

106.    An actual controversy has arisen and now exists between Prime Aid and Express Scripts as to Prime Aid's right to participate in Express Scripts' provider Network.

107.    Prime Aid has completely and exhaustively refuted all grounds which Express Scripts has cited as bases for its decision to reject Prime Aid's application to join Express Scripts' Network.

108.    At all times, Prime Aid has remained ready, willing and able to satisfy Express Scripts' terms and conditions for its Network pharmacies.

109.    New Jersey's Any Willing Provider Statute provides that PBMs are prohibited from excluding from their network any pharmacy that is willing to meet the terms and conditions that the PBM has set forth for its network pharmacies.

110.    Prime Aid has suffered, and will continue to suffer, damages, including irreparable harm, monetary damages, attorneys' fees, and costs, as a result of Express Scripts' unlawful rejection of Prime Aid's application to join Express Scripts' Network.

111.    Prime Aid seeks herein a declaration that Express Scripts has improperly rejected Prime Aid's application to join Express Scripts' Network and that Express Scripts' refusal to admit Prime Aid to Express Scripts' Network is in violation of New Jersey's Any Willing Provider laws.

## SECOND CAUSE OF ACTION:
## INJUNCTIVE RELIEF

112.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

113.    Express Scripts' rejection of Prime Aid's application to join Express Scripts' Network has caused and will continue to cause irreparable harm to Prime Aid.  For every week that Prime Aid is not a member of Express Scripts' Network, Prime Aid has lost millions of dollars in revenue.  Those revenues make up a large portion of Prime Aid's total revenue, and as an independent pharmacy, Prime Aid's viability and existence is threatened by Express Scripts' illegal rejection of Prime Aid's application.

114.    Should Express Scripts be permitted to continue in its illegal exclusion of Prime Aid from its Network and should Prime Aid be forced to close as a result of this illegal exclusion, no recovery of monetary damages at trial will be able to revive Prime Aid.

115.   In addition to threatening Prime Aid's viability, Express Scripts' rejection of Prime Aid from its Network threatens Express Scripts' specialty insureds who suffer from serious and chronic medical conditions.  The public interest, in the health and safety of New Jersey residents, is best served by injunctive relief against Express Scripts.  By enjoining Express Scripts from rejecting Prime Aid's application to join the Network, those patients will have greater access to vital health care and have greater choice among their health care providers, as New Jersey's Any Willing Provider statute clearly intended.

116.   Injunctive relief, which would allow Prime Aid to again serve Express Scripts insureds, will cause no harm to Express Scripts.  Instead, Express Scripts would continue reaping large profits, as it has for years.

117.   Prime Aid has at all times been and remains currently ready, willing and able to meet the terms and conditions that Express Scripts has set forth for its Network providers. Express Scripts' refusal to admit Prime Aid into its Network despite Prime Aid's willingness to accept the terms and conditions Express Scripts has set forth is in clear violation of New Jersey's Any Willing Provider statutes.

118.   Prime Aid requests that this Court enjoin Express Scripts from rejecting Prime Aid's application to join Express Scripts' and other relief as set forth in the prayer for relief.

## THIRD CAUSE OF ACTION:
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

119.   Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

120.   Express Scripts has a high degree of market or monopoly power in the market for specialty pharmacy services to New Jersey insureds who are locked into its Network, including

the absolute power to exclude competition from that market.  It has wrongfully used its power to exclude competition from the market to increase that market power.

121.    Express Scripts has wrongfully excluded its most significant local independent competitor, Prime Aid, from the relevant market contrary to the New Jersey Any Willing Provider laws and on pretextual grounds.

122.    Express Scripts' wrongful conduct, including its exclusion of Prime Aid from the Network, has been undertaken with a specific intent to monopolize the market for specialty pharmacy services to New Jersey insureds who are locked into its Network.

123.    Express Scripts has a reasonable probability of succeeding in monopolizing the market for specialty pharmacy services to New Jersey insureds who are locked into its Network based, inter alia, on its absolute control of access to the market, its elimination of competition from major independent specialty pharmacies like Prime Aid, its ability to grant collusive reciprocal rights to specialty pharmacies controlled by other PBMs while excluding all meaningful independent competition on level and quality of service, and its ability to direct lucrative specialty pharmacy business in the Network to its captive or affiliated mail order and specialty pharmacies.

124.    Express Scripts' monopolization and attempted monopolization violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    Express Scripts has exercised market power to exclude Prime Aid from competing in the markets in which Express Scripts competes with Prime Aid through its captive and/or affiliated mail order and specialty pharmacies.

126.    Express Scripts' exclusionary conduct, exercise of market power, monopolization and attempted monopolization have harmed competition and the welfare of consumers.  Prime

Aid has been injured in its business and property by reason of these violations of the Sherman Act, suffering antitrust injury caused by the anticompetitive and wrongful conduct of Express Scripts.

127.   Pursuant to the Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Prime Aid is entitled to treble damages, injunctive relief and costs including attorneys' fees.

## FOURTH CAUSE OF ACTION:
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

128.   Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

129.   Express Scripts has a high degree of market or monopoly power in the market for specialty pharmacy services to New Jersey insureds who are locked into its Network, including the absolute power to exclude competition from that market.  It has wrongfully used its power to exclude competition from the market to increase that market power.

130.   Express Scripts has abused the exclusivity granted under agreements with health plans wrongfully to exclude its most significant local competitor, Prime Aid, from the relevant market contrary to the New Jersey Any Willing Provider laws and on sham pretext grounds.

131.   Express Scripts has entered into agreements that restrain trade, and its wrongful conduct employing the restraints in those agreements has harmed competition and consumer welfare and Prime Aid, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

132.   Express Scripts' agreements with health plans, granting it exclusive rights to act as PBM for those health plans and employers through which it has wrongfully excluded Prime Aid from its Network and foreclosed Prime Aid's competition with its captive specialty pharmacy comprise unlawful agreements in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.   The agreements and Express Scripts' wrongful conduct have entirely foreclosed Prime Aid from competing in the relevant market for specialty pharmacy services to New Jersey insureds who are locked into its Network.

134.   Express Scripts has exercised market power to exclude Prime Aid from competing in the market in which Express Scripts competes with Prime Aid through its captive and/or affiliated mail order and specialty pharmacies.

135.   Express Scripts' exclusionary conduct, exercise of market power and its exclusive agreements have harmed competition and the welfare of consumers and Prime Aid has been injured in its business and property by reason of these violations of the Sherman Act, suffering antitrust injury caused by the anticompetitive and wrongful conduct of Envision.

136.   Pursuant to the Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Prime Aid is entitled to treble damages, injunctive relief and costs including attorneys' fees.

## FIFTH CAUSE OF ACTION:
## VIOLATION OF NEW JERSEY ANTITRUST ACT

137.   Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

138.   Express Scripts has market power in the market for specialty pharmacy services to New Jersey insureds who are locked in to its Network, including the absolute power to exclude competition from that market.

139.   Express Scripts has wrongfully excluded its most significant local competitor, Prime Aid, from the relevant market contrary to the New Jersey Any Willing Provider laws and on sham pretext grounds.  Its exclusion of Prime Aid from the Network is intended to eliminate competition from Prime Aid in order to allow Express Scripts to monopolize the market for specialty pharmacy services to New Jersey insureds who are locked into its Network.

140.   Express Scripts has a reasonable probability of succeeding in monopolizing the market for specialty pharmacy services to New Jersey insureds who are locked into its Network.

141.   Express Scripts' monopolization and attempted monopolization violates the New Jersey Antitrust Act, 1970 N.J. Laws ch. 73, codified at N.J. STAT. ANN. §§ 56:9-1 to -19.

142.   Express Scripts has entered into agreements that restrain trade, and its wrongful conduct employing the restraints in those agreements, has harmed competition and consumer welfare and Prime Aid, all in violation of the New Jersey Antitrust Act.

143.   Express Scripts' agreements with health plans, granting it exclusive rights to act as PBM for various health plans and through which it has wrongfully excluded Prime Aid from its Network and foreclosed Prime Aid's competition with its captive specialty pharmacy comprise unlawful agreements in restraint of trade in violation of the New Jersey Antitrust Act, 1970 N.J. Laws ch. 73, codified at N.J. STAT. ANN. §§ 56:9-1 to -19.

144.   Express Scripts has exercised market power to exclude Prime Aid from competing in the market in which Express Scripts competes with Prime Aid through its captive specialty pharmacy.

145.   Express Scripts' exclusionary conduct, exercise of market power and its exclusive agreements have harmed competition and the welfare of consumers and Prime Aid has been injured in its business and property by reason of these violations of the New Jersey Antitrust Act, suffering antitrust injury caused by the anticompetitive and wrongful conduct of Express Scripts.

146.   Pursuant to the New Jersey Antitrust Act, Prime Aid is entitled to treble damages, injunctive relief and costs including attorneys' fees.

147.   WHEREFORE, Plaintiff prays for judgment as follows:

     (a)     a declaration that Defendant is required to admit Plaintiff into its Network in accordance with New Jersey's Any Willing Provider statutes;

     (b)     an order enjoining Defendant from rejecting Plaintiff's application to join Defendant's Network;

     (c)     treble damage for injury to the business and property of Prime Aid caused by Express Scripts' violations of the Sherman Act and the New Jersey Antitrust Act;

     (d)     all of the costs of this action including, but not limited to, reasonable attorneys' fees; and

     (e)     any further and additional relief as this Court may deem just and proper.

## JURY DEMAND

148.    Plaintiffs hereby demand a jury trial.

DUANE MORRIS LLP

_/s/ Jonathan L. Swichar_
Jonathan L. Swichar (020721997)
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone:  973-424-2000
Fax:  973-424-2001
_Attorneys for Plaintiff_

Dated: April 19, 2016

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I HEREBY CERTIFY that the matter in controversy is not the subject of any other action pending in any other court or of any pending arbitration or administrative proceeding.

DUANE MORRIS LLP

/s/ Jonathan L. Swichar
Jonathan L. Swichar (020721997)
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone:  973-424-2000
Fax:  973-424-2001
*Attorneys for Plaintiff*

Dated:  April 19, 2016